STATE OF CONNECTICUT *v.* RAFAEL CRESPO, JR.
(AC 28373)

Harper, Lavine and Peters, Js.

Argued October 27, 2008—officially released May 12, 2009

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

Opinion

HARPER, J. The defendant, Rafael Crespo, Jr., appeals from the judgment of conviction, rendered after a jury trial, of assault in the third degree in violation of General Statutes § 53a-61 (a) (1) and two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1).[1] The defendant claims that the court improperly (1) excluded evidence related to the prior sexual history of the victim, (2) permitted the state to present evidence concerning the behavior of sexual assault victims generally and (3) failed, following an in camera review of the victim's medical records, to disclose fully to the defendant material information from such records. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant met the victim during the summer of 2002, and the two began dating. At times relevant, the defendant was a police officer and the victim was a college graduate student. In the months prior to December, 2002, the two engaged in sexual activities

---

[1] The jury returned a not guilty verdict with regard to a count of kidnapping in the second degree as well as two additional counts of sexual assault in the first degree. The jury returned a guilty verdict with regard to an additional count of assault in the third degree, but the court later dismissed this count prior to sentencing. The court imposed a total effective term of incarceration of twenty-six years, execution suspended after fourteen years, followed by a fifteen year term of probation.

together, but this conduct did not include vaginal or anal intercourse. In December, 2002, the defendant forcibly engaged in vaginal intercourse with the victim but, prior to this sexual encounter, she had been a virgin.[2] On February 4, 2003, the victim sought medical attention at a college health clinic. Although the victim reported to a nurse that she had been raped, the victim declined to report the incident to the police. The victim believed that if she were to report the incident, the defendant's status as a police officer would protect him and that he would retaliate against her.

Following this incident, the victim's physical and psychological well-being suffered. The victim took steps to distance herself from the defendant. For example, on several occasions she did not return the defendant's telephone calls or e-mails. The defendant persisted in his efforts to continue the relationship by calling and e-mailing the victim. Also, he appeared uninvited at both her residence and place of employment. Nonetheless, the victim's relationship with the defendant continued, and she accepted favors and gifts from the defendant and, on occasion, accepted his invitations to dinner and the like. The defendant's relationship with the victim, however, was characterized by violent outbursts. During an incident in March, 2003, the defendant unexpectedly visited the victim at her residence. The defendant angrily accused the victim of making herself look good so that she could attract other men. The defendant called the victim a slut and physically assaulted her by punching her and pulling her hair.[3] The defendant told the victim that he wanted to end their relationship, yet the defendant thereafter contacted the victim. The defendant repeatedly threatened

---

[2] The state charged the defendant with sexual assault in the first degree in connection with this incident, but the jury returned a not guilty verdict as to this count.

[3] The state did not bring any charges in connection with this incident.

the victim, both implicitly and explicitly, with physical violence. Although the victim feared the defendant, she continued to spend time with him, often in public settings, and did not report any incidents of abuse to law enforcement personnel.

In June, 2003, the victim returned to Connecticut from a family engagement in another state. The defendant had instructed the victim to call him while she was away, but the victim had called him only once. When the victim arrived at the airport, the defendant was waiting there for her and, taking her by the hand, angrily led her away from the airport. The defendant drove the victim to her residence. Upon accompanying the victim inside, the defendant played the messages that had been left on the victim's telephone answering machine while she was away. Consequently, the defendant heard a message left for the victim from a man who had met the victim at a local nightclub. The caller indicated that he thought the victim was attractive and that he wanted to see her again.

Upon hearing this message, the defendant became irate. The defendant physically assaulted the victim by slapping the victim's face, pulling her hair, punching her, kicking her and knocking her to the floor. The defendant called the man who had left the message for the victim; he argued and yelled at him while the victim pleaded for the defendant to stop.

After the defendant ended the telephone conversation, he continued his physical assault of the victim. Despite her protests, the defendant hit, kicked and punched the victim about her body while yelling at her and calling her a whore. The defendant punched the victim in the face and knocked her to the floor. Thereafter, the defendant forcibly removed the victim's clothing and vaginally raped her.[4] Following the sexual

---

[4] In connection with this incident, the state charged the defendant with one count of assault in the third degree and one count of sexual assault in the first degree. Following the jury's guilty verdict as to both of these counts,

assault, the defendant left the residence. The victim reported this assault to her mother but not to the police. Shortly after this incident, the defendant sent the victim an e-mail in which he expressed his intent to stop interacting with the victim. Nevertheless, the defendant later resumed having contact with the victim.

On May 15, 2004, the defendant drove to the victim's place of employment, and the victim permitted the defendant to take her shopping and to a movie. The defendant drove the victim to a shopping mall, where he purchased undergarments for her. Later, while the two were watching a movie, the defendant became upset with the victim and hastily left the movie theater. The victim left the theater with the defendant in his automobile. Following a dispute over the victim's sunglasses, the defendant became more and more agitated while driving the victim home. He began striking his steering wheel and was brandishing a gun. The defendant drove his automobile into a parking lot where he began to beat the victim. The victim exited the automobile, but the defendant pursued her and continued to strike her. The defendant kicked the victim, causing her to fall to the ground. Among her injuries, the victim sustained a significant elbow injury. When the victim was unable to rise from the pavement, the defendant drove away from the scene. Several minutes later, the defendant returned and forced the victim into the automobile by pulling her hair and pushing her into the passenger seat.[5]

The victim told the defendant that she did not want others at her college residence to see her in the condition that she was in. At her suggestion, the defendant drove her to his parents' home, where the victim stayed

the court dismissed the former charge. The defendant was convicted of the latter charge.

[5] The defendant was convicted of assault in the third degree in connection with this incident.

for several days. Thereafter, the defendant and his father drove the victim back to her place of employment.[6] In the following days, the victim sought treatment for her injuries from medical personnel at her college. At this time, the victim suffered emotionally, and her physical injuries ranged from the injury to her elbow to dehydration. The victim told a nurse and a physician that her boyfriend had beaten and sexually assaulted her. An administrator at the victim's college also became aware of the victim's condition as well as the victim's concern for her safety. As a result, the victim moved into a more secure dormitory at the college. Despite discussing her claims of abuse with these individuals associated with her college, the victim declined to report the incidents of abuse to the police.

In mid-June, 2004, on the victim's birthday, the defendant called the victim at her place of employment approximately fifty times. The victim agreed to go to dinner with the defendant. After dinner, the two returned to the victim's residence. The defendant, who was cordial during the date until this time, became irritable. He removed his clothing, accused the victim of staining his shirt during dinner and demanded that she clean the shirt. Upon the victim's refusal, the defendant's anger escalated, and he became verbally abusive. Then, the victim and the defendant engaged in consensual vaginal intercourse. Afterward, the defendant forcibly engaged in anal intercourse with the victim against her will.[7] The defendant later left the victim's apartment while she was showering.

---

[6] The victim claimed that the defendant forcibly engaged in anal intercourse with her during her stay at his parents' home. The state charged the defendant with sexual assault in the first degree in connection with this claim, but the jury returned a verdict of not guilty as to this charge. Additionally, the victim claimed that the defendant kept her at his parents' home against her will. The state charged the defendant with kidnapping in the second degree in connection with this claim, but the jury returned a verdict of not guilty as to this charge.

[7] The defendant was convicted of sexual assault in the first degree in connection with this incident.

The defendant and the victim remained in contact following this incident. By November, 2004, the victim had taken steps to end the relationship despite the defendant's efforts to continue the relationship. In December, 2004, the victim reported the incidents of abuse to a police officer. The defendant's arrest followed.

At trial, the defendant acknowledged that he and the victim had been in a stormy romantic relationship but denied that he had threatened or assaulted her. The defendant testified that he and the victim had engaged in consensual sexual intercourse shortly after they began dating in June, 2002. With regard to the injury to the victim's elbow, for which she had received medical attention, the defendant testified that it occurred accidentally, not during a physical assault. The defendant testified that he had given the victim numerous types of assistance, including financial assistance, during their relationship but that she was possessive, jealous and, at times, irrational during her interactions with him. He testified that he voluntarily had ended his relationship with the victim in November, 2004. Following the jury's guilty verdict as to four counts of the state's information, and the court's judgment of conviction as to three of those counts, this appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly precluded him from introducing evidence related to the sexual history of the victim. We disagree.

The following additional facts underlie the defendant's claim. Prior to the presentation of evidence, the state filed a motion to preclude evidence of sexual conduct between the victim and persons other than the defendant. The state asked the court to require the defendant to make an offer of proof concerning any

such evidence outside of the jury's presence in accordance with the procedures outlined in the rape shield statute, General Statutes § 54-86f. The court noted that, at that time, the state was not asking for the preclusion of such evidence but requesting that the court rule on the admissibility of such evidence in accordance with the rape shield statute. Absent objection, the court granted the state's request to analyze the evidence in this manner.

During the state's direct examination of the victim, the victim testified that she first came to the United States from another country when she was eleven years old and, later, returned when she was approximately fifteen years old. When she returned to the United States as a teenager, she lived with relatives and attended high school. Later, while she attended college, she stayed with and received financial assistance from Gordon Anic, a friend of her aunt who was a pastor of a church. Anic, she testified, assisted college students in financial need.

The victim testified that prior to her relationship with the defendant, she had not had a boyfriend and that she began her relationship with the defendant when she was approximately twenty-six years old. The victim also testified that, prior to having been forced by the defendant to engage in vaginal intercourse in December, 2002, she was a virgin. Describing the sexual activities that she and the defendant engaged in prior to this alleged incident of sexual assault, the victim testified that she and the defendant had not engaged in "real sex" but had lain together while kissing and rubbing against each other. She further testified that as part of this sexual activity, the defendant would ejaculate on her body. The victim testified that she had informed the defendant on many occasions that she was a virgin. She testified: "I had explicitly told him that I didn't want to have sex before marriage because this was something

that was extremely important to me, personal[ly], morally, religiously . . . on many levels."

The victim testified that in December, 2002, the defendant told her that he was not satisfied with the sexual activities in which they had been engaging and then forcibly engaged in vaginal intercourse with her. The victim testified that, after this incident, she felt a great loss and that the defendant smiled, laughed and stated, "you are not a virgin anymore." The victim described her emotional state as follows: "I felt like a part of me was murdered, basically. I wasn't ready for this. I didn't want this. Um, I was devastated. . . . [T]his is something I protected for so long. . . . I just sat there . . . and kept crying and crying. After that I just felt like a part of me was killed."

The parties stipulated that the victim's allegation that the defendant had forcibly engaged in vaginal intercourse with her in December, 2002, did not appear in any of the police reports or taped statements of the victim that were generated in connection with this case. During cross-examination of the victim, the defendant's attorney inquired as to why the victim waited until the time of trial to discuss this incident. The victim testified that when she spoke with the police, it was difficult for her to relate in a narrative style all of the incidents of assault and that she had done the best she could to recall all of the relevant events. The victim testified that she did not want her family, friends or college adviser to find out about the incident and that she had experienced feelings of embarrassment, shame and worthlessness. The victim recalled speaking to her mother, who was in her home country, about another incident of sexual assault by the defendant and that her mother was neither supportive of nor reassuring to her. The victim stated that, from her mother's perspective, it was important for her to remain a virgin until marriage and that her loss of virginity prior to marriage tended to

bring embarrassment to her and her family. The victim also explained that in the culture of her home country, men prefer women who are virgins because "that means that [such women] will be faithful and chaste."

The victim also testified, during cross-examination, that, on the basis of her personal and religious beliefs, she had preferred to remain a virgin until she was married. The defendant's attorney cross-examined the victim with regard to her testimony that she was a virgin prior to the incident in December, 2002. The victim reiterated that she was a virgin in December, 2002, but could not recall if she was taking any birth control medications at that time.

As the cross-examination of the victim progressed, the defendant's attorney asked about the nature of her relationship with Anic. The victim testified that Anic was a relative and that she lived with him after she graduated from college. She testified that Anic, a pastor, helped students pay for college and that Anic's church, in addition to her parents, paid for her undergraduate college education. After being shown a document, the victim recalled that Anic had once given her $500 in spending money.

Following this testimony, at the request of the defendant's attorney, the court excused the jury. The defendant's attorney informed the court that the defense wanted to present evidence in the form of statements made by the victim to a psychiatrist who had treated the victim. Those statements reflected that the victim had been engaged to Anic from the time she began living with him until February, 2005, and that she had engaged in sexual activities with Anic, including oral intercourse. The defendant's attorney also stated that, similar to the sexual activities that occurred between the victim and the defendant, he wanted to present evidence that the victim and Anic had lain in bed

together, had engaged in "petting" activities and that Anic had ejaculated on the victim's body. The defendant's attorney stated that he wanted to inquire of the victim whether she had met with Anic during the course of her relationship with the defendant and whether she had engaged in any sexual activity with Anic.

The court inquired specifically as to the relevance of the evidence of sexual activity between the victim and Anic. The defendant's attorney argued that the evidence was relevant because both the defendant and Anic had engaged in similar sexual activities with the victim and had supported the victim financially. The defendant's attorney argued that this evidence helped to demonstrate that if the defendant had ended the relationship with the victim, the victim would have a reason to be upset with him. The defendant's attorney also argued that the evidence tended to demonstrate that the victim was "deceptive throughout [her] relationship" with the defendant, which was relevant to evaluating her truthfulness. The defendant's attorney further argued that the evidence was admissible under § 54-86f (4) for the purpose of cross-examining the victim with regard to her bias, interest and motive.

The court indicated that it did not view as relevant the evidence concerning intimate conduct between the victim and Anic. The court ruled that the defendant's attorney could inquire during cross-examination as to the nature of the victim's relationship with Anic and whether she accepted money from Anic while she was in a relationship with the defendant. The court, however, precluded the defendant from inquiring as to the victim's sexual activity with Anic. The court ruled: "Unless you have a good faith basis to ask questions which undermine her claim in front of this jury that she was a virgin prior to June, 2002, I see the rape shield law as precluding inquiry into those areas."[8]

---

[8] After the jury returned its guilty verdict, the defendant filed a motion for a new trial. The defendant argued, in part, that the court's ruling "eviscer-

As cross-examination of the victim progressed, the victim testified that Anic had assisted her financially throughout her undergraduate college education, the assistance coming mainly through his church. The victim testified that she had lived with Anic for three years while she attended a graduate study program in Colorado just prior to moving to Connecticut and that he had offered to purchase food for her. The victim denied that she had ever been engaged to Anic or that she had made such a statement to her psychiatrist. She testified that she could not recall the last time she had seen Anic but recalled having seen him once or twice during her relationship with the defendant. She testified, however, that she had told the defendant about those encounters. The defendant's attorney asked the victim if she had provided the police with a statement indicating that the defendant was not aware "of what had transpired between her and Gordon Anic." The court, concluding that evidence of Anic's sexual conduct with the victim was not probative with regard to assessing the victim's credibility, sustained the state's objection to the line of inquiry. Thereafter, the victim testified that while she was attending college in Connecticut, Anic had made payments on an automobile that he had purchased for her. She also testified that she believed that the defendant was aware of that purchase.

On appeal, the defendant argues that the court improperly precluded evidence that the victim had a sexual relationship with Anic. The defendant argues that this evidence was admissible under § 54-86f (2) and (4) and that its preclusion violated his state and federal constitutional rights to confront his accuser, to present a defense and to due process.[9]

---

ated" his right to cross-examine the victim concerning the extent of her relationship with Anic. The court denied the defendant's motion.

[9] The defendant has alluded to his rights under our state constitution but has not provided this court with an independent analysis of his state constitutional claim as is required under *State v. Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). We therefore limit our review to the defendant's

"Upon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence and the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 173, 777 A.2d 604 (2001).

"The rape shield statute excludes evidence of prior sexual conduct of the victim of a sexual assault, unless one of the statutory exceptions is satisfied. . . . The statute was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material. . . . Our legislature has determined that, except in specific instances, and taking the defendant's constitutional rights into account, evidence of prior sexual conduct is to be excluded for policy purposes. Some of these policies include protecting the victim's sexual privacy and shielding her from undue harassment, encouraging reports of sexual assault, and enabling the victim to testify in court with less fear of embarrassment. . . . Other policies promoted by the law include avoiding prejudice to the victim, jury confusion and waste of time on collateral matters. . . .

"Although the state's interests in limiting the admissibility of this type of evidence are substantial, they cannot by themselves outweigh the defendant's competing constitutional interests. . . . The determination of whether the state's interests in excluding evidence must yield to those interests of the defendant is determined by the facts and circumstances of the particular case.

federal constitution claim. See, e.g., *State* v. *Nash*, 278 Conn. 620, 623 n.4, 899 A.2d 1 (2006).

. . . [T]he right to confront and cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . Such an interest includes the trial court's right, indeed, duty, to exclude irrelevant evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Christiano*, 228 Conn. 456, 469–70, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994).

General Statutes § 54-86f provides in relevant part: "In any prosecution for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is . . . (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct . . . or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ."

"Section 54-86f provides for a two step process before evidence proffered by a defendant as falling under one of the statute's exceptions may be admitted. First, if the defendant has satisfied his preliminary burden in his offer of proof to show that the evidence is potentially relevant, pursuant to the statute the trial court must conduct a hearing to determine the admissibility of the evidence. Second, [i]f, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . . General Statutes § 54-86f.

"In the first step of this two part process, the defendant bears the burden of showing that the proffered evidence overcomes the presumption, inherent in § 54-86f, that evidence of the sexual conduct of a rape victim

is inadmissible and satisfies the statute's requirement that only evidence relevant to the case, rather than evidence relevant merely to demonstrate the unchaste character of the victim, be admissible. . . .

"If the trial court determines that the evidence is relevant and admissible under one of the exceptions enumerated in § 54-86f, the trial court must proceed to the second part of the two part process outlined in the statute. That is, the evidence is admissible only if its probative value outweighs the prejudicial impact on the victim. . . .

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . In considering whether evidence was sufficiently relevant to fall under one of the exceptions enumerated in § 54-86f, we have drawn a distinction between, on the one hand, evidence that is relevant to establish some portion of the theory of defense or rebut some portion of the state's case, which is admissible if the court determines that the probative value of the evidence outweighs its prejudicial impact on the victim, and, on the other hand, evidence that is offered as an impermissible attempt to establish the victim's general unchaste character as prohibited by the rape shield statute." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 280 Conn. 285, 295–97, 907 A.2d 73 (2006).

After making an offer of proof, the defendant's attorney attempted to demonstrate that evidence and inquiry

related to the victim's sexual conduct with Anic was relevant. Essentially, the defendant's attorney argued that the victim had engaged in similar sexual acts with the defendant and Anic, and that both men had assisted her financially. On the basis of these facts, the defendant's attorney stated that the evidence of intimate contact between the victim and Anic helped to demonstrate the victim's bias, interest and motive. The court indicated that it did not view the evidence as relevant to any issue in the case. Apart from reviewing the arguments raised at the time of the defendant's proffer, we also carefully have reviewed the arguments raised in connection with the defendant's motion for a new trial. He argued in connection with that motion that the court's ruling as to the admissibility of the evidence at issue limited his ability to cross-examine the victim and to "expose other relationships that [the victim] was engaging in during the time of her relationship with [the defendant]."

The proffering party bears the burden of establishing the relevance of offered evidence. See *State* v. *Andrews*, 248 Conn. 1, 12, 726 A.2d 104 (1999). Reviewing the ground of relevancy asserted at trial, we conclude that the proffered evidence was unrelated to any material issue before the jury. In his brief to this court, the defendant elaborates on the relevancy arguments he raised at trial. The defendant argues that the evidence that the victim had engaged in sexual activities with Anic while Anic provided her with financial support would have shed light on the victim's motive, bias and interest. The defendant argues that the fact that both he and Anic gave the victim financial support while engaging in sexual activities with the victim would have helped to demonstrate that "[w]hen the defendant broke off [the relationship] with the [victim], she would have reason to be upset because he financially helped

her." The defendant asserts that his inability to introduce evidence that the victim "was used to accepting financial assistance in sexual relationships" made it far more difficult for him to demonstrate that the victim's testimony was motivated by her anger toward him for having ended their relationship. The defendant also argues that the evidence would have demonstrated that the victim had been "deceptive throughout her relationship with [him]."

The defendant has not persuaded us that the evidence was relevant to understanding the victim's motive, bias or interest. The court permitted the defendant to present evidence that both the defendant and Anic supported the victim financially, as this evidence tended to support the defendant's theory that the victim had engaged in relationships for financial gain. We fail to see how evidence that the victim and Anic had engaged in sexual activities would have strengthened to any degree the defendant's argument that the victim was motivated to fabricate claims of sexual assault because the defendant had ended his relationship with her. To the extent that the defendant argues that the exclusion of this evidence precluded him from demonstrating that the victim had deceived him by failing to reveal the sexual nature of her relationship with Anic, we conclude that this argument is too far attenuated from any material issue in the case to justify the admission of this evidence. Accordingly, we conclude that the court properly precluded this evidence on the ground of relevance.

The defendant argues that the court's ruling violated his right to confrontation. This aspect of the claim requires little discussion. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. . . . The constitutional standard [for cross-examination] is met when defense counsel is permitted to expose to the

jury the facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Cassidy*, 3 Conn. App. 374, 381, 489 A.2d 386, cert. denied, 196 Conn. 803, 492 A.2d 1239 (1985). "It is axiomatic that [a criminal] defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. . . . The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination." (Citation omitted; internal quotation marks omitted.) *State* v. *Glenn*, 97 Conn. App. 719, 726, 906 A.2d 705 (2006), cert. denied, 281 Conn. 913, 916 A.2d 55 (2007).

We already have determined that the evidence at issue properly was precluded on the ground of relevance. The defendant cannot demonstrate that the court's proper application of a fundamental rule of evidence infringed on his right to confront his accuser. Additionally, having carefully examined the transcript of proceedings and the evidence presented at trial, we conclude that the defendant fully availed himself of his right to present evidence from which the jury could evaluate the victim's credibility. As it relates to the particular theory of defense for which the defendant sought the admission of the sexual conduct evidence, we observe that he brought to light many facts concerning the victim's relationship with Anic and the fact that he, like Anic, provided financial support to the victim. The cross-examination, without the proffered evidence, was sufficient to provide facts from which the jury could assess the victim's testimony. See *State* v. *Asherman*, 193 Conn. 695, 721, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

The defendant also alleges a violation of his right to present a defense, arguing that the court improperly precluded material and relevant evidence. The defendant has not distinguished this claim from his confrontation clause claim. Nonetheless, our conclusion that the court properly precluded the evidence on the ground of relevance leads us to conclude that the preclusion of the evidence did not violate his constitutional right to present evidence in his defense. "As to the defendant's right to present a defense, [t]he sixth amendment to the United States constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . [T]he constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence was properly excluded." (Citation omitted; internal quotation marks omitted.) *State* v. *Andrews*, 102 Conn. App. 819, 826–27, 927 A.2d 358, cert. denied, 284 Conn. 911, 931 A.2d 932 (2007). The record reflects that during the trial, the defendant vigorously cross-examined the state's witnesses and presented much evidence in support of his theory of defense. Accordingly, we conclude that the court's preclusion of irrelevant evidence did not infringe on his right to present a defense.

Before ending our discussion of the defendant's claim, we must address another aspect of it. For the first time on appeal, the defendant argues that the evidence was admissible under § 54-86f (2) to refute the victim's credibility. In this regard, the defendant argues that the evidence of sexual activity between the victim and Anic was relevant to refute the victim's testimony on direct examination that prior to her relationship with

the defendant, she did not have a boyfriend and that prior to the alleged sexual assault in December, 2002, she had been a virgin. According to the defendant, the victim had concealed from the jury her sexual relationship with Anic, and the court's evidentiary ruling precluded him from exposing this fact to the jury.

The defendant did not raise this ground of relevance before the trial court. A thorough analysis of relevance by the trial court is possible only after a proffering party sets forth the grounds on which it believes the evidence is related to a material issue in the case. "A clear statement of the defendant's theory of relevance is all important in determining whether the evidence is offered for a permissible purpose." *State* v. *Sullivan*, 244 Conn. 640, 647, 712 A.2d 919 (1998). Ordinarily, we will not consider a theory of relevance that was not raised before the trial court. See *State* v. *Pratt*, 235 Conn. 595, 602, 669 A.2d 562 (1995). The defendant, however, does not bring a purely evidentiary claim but claims that the exclusion of the evidence deprived him of his right to confrontation and his right to present a defense. The defendant asserts that all aspects of his claim properly were preserved but also asserts that the claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

The record is adequate to review this aspect of the defendant's claim, and it is of constitutional magnitude, alleging the deprivation of the defendant's sixth amendment rights. "When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, [despite what might be considered a sufficient offer of proof] such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense." (Internal quotation marks omitted.) *State* v. *Rolon*,

supra, 257 Conn. 177. We conclude, however, that the claim fails under *Golding*'s third prong.[10]

As stated previously in this opinion, the preclusion of irrelevant evidence does not infringe on a defendant's right to confrontation or his right to present a defense. The defendant argues that the proffered evidence of sexual activity between the victim and Anic was relevant with regard to the victim's credibility. Specifically, the defendant asserts that the evidence contradicted the victim's testimony on direct examination that she had no prior boyfriends and had been a virgin prior to the sexual assault in December, 2002.

As a preliminary matter, we observe that the court permitted inquiry concerning the victim's relationship with Anic. The defendant's attorney asked the victim whether she had been engaged to Anic and what type of financial assistance he had provided to her. During her direct examination, the victim did not testify that she had not engaged in any sexual activities with men prior to her relationship with the defendant; she testified that she had been a virgin and that the defendant was her first boyfriend. Thus, we are not persuaded that evidence that the victim had engaged in sexual activities with Anic was relevant on the ground that it contradicted the victim's testimony concerning prior boyfriends. Further, we are not persuaded that evidence

---

[10] In *State* v. *Golding*, supra, 213 Conn. 239–40, our Supreme Court provided: "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances."

of the sexual activity at issue, consisting of oral intercourse and petting, contradicted the victim's testimony that she had been a virgin prior to the time at which the defendant forcibly engaged in penile-vaginal sexual intercourse with her. It is clear from our review of the proceedings that the victim considered herself to be a virgin prior to the time that the defendant forcibly engaged in penile-vaginal sexual intercourse with her. The proffered evidence did not contradict the victim's testimony regarding the loss of her virginity.[11] Accordingly, we reject the defendant's claim that the proffered evidence was relevant to the issue of the victim's credibility. The defendant has not demonstrated that the preclusion of the evidence on the ground of relevance was improper and, thus, has not demonstrated that a constitutional violation clearly exists that clearly deprived him of a fair trial.

II

Next, the defendant claims that the court improperly permitted the state to present evidence of the behavior of sexual assault victims generally. We disagree.

The following additional facts underlie the defendant's claim. Prior to the commencement of jury selection, the defendant filed a motion for notice of the subject matter of expert testimony to be elicited by the state at trial. In argument on the motion, the defendant's attorney indicated that it was his understanding that

---

[11] For this reason, the defendant's considerable reliance on *State* v. *Ritrovato*, 280 Conn. 36, 905 A.2d 1079 (2006), is misplaced. In *Ritrovato*, our Supreme Court concluded that a trial court had committed reversible error by precluding statements made by a complainant in a sexual assault case concerning her prior sexual conduct. Id., 44–58. The court, however, reached its holding after concluding that the proffered evidence, statements made by the complainant that directly contradicted her trial testimony that she had been a virgin when she was first assaulted, was "highly probative" on the issue of the complainant's credibility. Id., 54. Here, we disagree with the defendant's assertion that the proffered evidence was highly probative with regard to any material issue before the jury.

the state intended to present testimony from David Johnson, a doctor of psychology. The defendant's attorney requested that the state disclose Johnson's proposed testimony outside the jury's presence, that he be afforded an opportunity to voir dire Johnson and that the court hold a hearing related to the admissibility of Johnson's testimony. The prosecutor indicated that Johnson was the codirector of the Yale Post Traumatic Stress Center, that he had expertise in treating sexual assault victims and familiarity with scholarly studies related to the psychology of sexual assault victims. The prosecutor indicated that the state intended to question Johnson concerning behaviors exhibited by victims of sexual abuse generally and to present hypothetical questions to Johnson, presumably related to the facts of this case. The court instructed the state to make a proffer concerning Johnson's testimony prior to the conclusion of jury selection so that it could rule on the admissibility of the evidence.

Later, during jury selection, the defendant filed a motion in limine related to Johnson's testimony and asked the court to establish fair procedures for a consideration of the admissibility of his testimony. Following argument on the motion, the court ruled that it would defer considering the admissibility of Johnson's testimony. The court directed the state to disclose to the defense the gist of Johnson's testimony. The court also ruled that before it would permit the state to present Johnson's testimony before the jury, the defendant would have an opportunity to voir dire Johnson and raise arguments related to the admissibility of his testimony.

During the state's case-in-chief, the prosecutor disclosed several hypothetical questions, containing facts that mirrored those in evidence, that he intended to ask of Johnson. The questions elicited expert opinion testimony as to whether a person with the victim's characteristics who had engaged in conduct like that of the victim could be said to have behaved in a manner

typical of sexual assault victims generally. Outside of the jury's presence, the state asked Johnson several questions concerning his areas of expertise as well as his treatment of sexual assault victims. Johnson testified that he had treated several hundred sexual assault victims during his career. The defendant's attorney asked Johnson a few questions concerning false reports of sexual assault by persons believing such reports to be true. Johnson testified that there was no syndrome specific to sexual assault victims, but that "a variety of conditions [could] result from" a sexual assault. In light of the state's proffer, the defendant's attorney argued that Johnson's testimony would "concisely fit" the evidence presented at trial and, thus, would "completely bolster the victim's credibility." Essentially, the defendant's attorney argued that it was improper for Johnson to testify that the victim's conduct was consistent with that of sexual assault victims generally. According to the defendant's attorney, such testimony impermissibly bolstered the victim's credibility and infringed on the defendant's right to confrontation.

The court overruled the defendant's objection to the state's line of inquiry. The court stated: "[T]hese are hypothetical questions, which . . . largely take the [victim's] version of what happened. And if the jury doesn't find that to be what happened, well, then . . . whatever opinions flow from that may be subject to question. So . . . the state is entitled to present this evidence to the jury for [its] consideration . . . ."[12]

Thereafter, the state called Johnson to testify. The state asked Johnson several hypothetical questions that mirrored the victim's version of events. In each case, Johnson testified that the hypothetical victim described

[12] In addition to the objections raised to Johnson's testimony prior to the jury's verdict, the defendant argued in his motion for a new trial that the admission of Johnson's testimony "explain[ed] away" the victim's delay in reporting the alleged sexual abuse and that it unfairly bolstered the victim's credibility.

in the questions had behaved in a manner consistent with victims of sexual assault generally.[13]

The defendant's arguments on appeal may be summarized as follows. First, the defendant argues that Johnson's testimony was irrelevant because Johnson

---

[13] The prosecutor asked the following questions of Johnson: "Doctor, I'm going to pose to you a hypothetical and, as we go on, I may build on this hypothetical, so I'd like you, for the questions that will come, to assume for me the following facts: that a woman in her mid-twenties is a virgin; that her virginity is very important to her; that she is residing in a city where she has no close friends and no family members; that she meets an apparently pleasant, attentive man . . . and begins dating him regularly; that she engages in sexual touching as much as several times a week with the man, but she makes clear to him that she does not want to have intercourse prior to marriage; that several months into the relationship this man forces her to engage in sexual intercourse, which, both physically and emotionally, takes her virginity; that he laughs about her emotional devastation immediately after that forced intercourse; that in reaction to this violent episode she begins to sleep poorly, show signs of depression and signs of anxiety; that from the time of this violence the assailant alternatively praises and belittles her; that whenever she says she wants to break up with him, he threatens her and then he begins to show anger at less and less provocation and begins to slap and kick her on a regular basis. Now, a question based upon that hypothetical person: Would it be consistent with the behavior of victims of sexual assault that . . . the victim would continue to date this man?" Johnson replied in the affirmative.

"Would it be consistent with the behavior of victims of sexual assault that this victim, the hypothetical victim I've described to you, would submit to sexual intercourse with the assailant regularly . . . without objecting, without . . . specifically saying no, over a period of time?" Johnson replied in the affirmative.

"Assume that the assailant is a police officer; that the victim was raised in a society where the police were routinely violent, even though, other than this assailant, she has seen no police violence in the United States; that the frequency of both the anger and physical abuse escalates over time; that threats against her safety become more precise; that is, phrases like 'I could kill you' or references to a firearm or presence of a firearm or statements . . . that any attempt to apprehend him or if the police came around, he'd kill her, them and himself, that kind of thing. Would it be consistent with the behavior of victims of sexual assault for the victim to ignore advice even from medical professionals that she get out of the relationship, that she try to terminate it, or that she go to the police?" Johnson replied in the affirmative.

"Assume that . . . the hypothetical victim does tell some friends, some acquaintances, some family that abuse is going on but doesn't give them very many details. Would that be surprising given what you know about the reactions of victims of sexual abuse?" Johnson replied in the negative.

"[A]ssume that a victim of sexual assault does get up the courage to report . . . that sexual assault or physical assault or both have been going on over a period of time to the police, and they sit down for an interview. Is it common or uncommon, for particularly in early interviews, for them not to be able to . . . talk about every single incident?" Johnson opined that it was very common.

Following each question, Johnson explained his answer in greater detail. Johnson also testified that he did not know anything else about the case other than the hypothetical facts related to him in the prosecutor's questions.

testified that a syndrome specific to adult sexual assault victims does not exist but that such victims experience a wide range of reactions and exhibit a variety of symptoms. Second, the defendant argues that expert testimony related to the psychology of sexual assault victims generally was not necessary in this case because "[i]t was not beyond the jurors' knowledge and experience to understand the [victim's] behavior during the course of her relationship with the defendant . . . ." Likewise, the defendant argues that expert testimony was not helpful for the jury to evaluate the victim's explanations for remaining in the relationship with the defendant following the alleged assaults and failing timely to report the incidents to the police. Third, the defendant claims that the state's hypothetical questions closely tracked the evidence in this case, such that Johnson's testimony unfairly bolstered the victim's credibility.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 629, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005); see also Conn. Code Evid. § 7-2.

We first address the defendant's relevancy claim. Several times during his testimony, Johnson opined that the victim's behavior was consistent with the behavior of victims of sexual assault. After answering each hypothetical question posed by the state, Johnson explained the basis for his response in terms of what psychological factors are common among sexual assault victims.

Johnson, however, refuted the notion that a specific psychological profile or response is common to all adult victims of sexual assault. Johnson explained that although all victims of sexual abuse do not behave in the same manner, he was able to draw on his experience in treating hundreds of victims and characterize certain behavior to be "more common" or reasonably to be expected in victims of sexual assault. Johnson did not testify that the psychological response to sexual abuse varied from person to person to such a degree that he was unable to discuss generally characteristics common among such victims.

Having reviewed Johnson's testimony in its entirety, it is clear that, on the basis of his extensive experience, the court properly concluded that he was able to evaluate a hypothetical victim's behavior by comparing it with that of sexual abuse victims generally. Such expert testimony, related to the issue of delayed reporting of sexual abuse, falls within the type of social framework testimony that has been deemed relevant in assessing a victim's conduct in cases of sexual abuse. See *State v. Ali*, 233 Conn. 403, 433, 660 A.2d 337 (1995). We are not persuaded that Johnson did not have knowledge that directly applied to a matter at issue. A central issue at trial related to the victim's conduct, specifically, her failure to report the assaults in a timely manner, as well as her continued relationship with the defendant following the instances of abuse. Johnson's testimony and expertise was directly relevant to the jury's assessment of this conduct.

The defendant also argues that Johnson's testimony was inadmissible because the jurors had the knowledge and experience to assess the victim's conduct. The state presented evidence that the defendant had engaged in a lengthy pattern of physical and emotional abuse of this victim and that he had sexually assaulted the victim on numerous occasions. "The psychology of a victim

of such abuse, is in all likelihood . . . beyond the jury's experience and knowledge." (Internal quotation marks omitted.) *State* v. *Freeney*, 228 Conn. 582, 592, 637 A.2d 1088 (1994). In light of the alleged crimes and the manner in which they were alleged to have occurred, we are not persuaded that the average juror likely would have knowledge of the psychological factors typical of the victims of such crimes. We are also not persuaded that Johnson's testimony was not helpful to the jury in assessing the victim's conduct.

Finally, the defendant argues that the state's hypothetical questions so closely tracked the facts of this case that Johnson's testimony unfairly bolstered the victim's credibility. In terms of admissibility, courts must distinguish between expert testimony from which the trier of fact may evaluate a victim's credibility and expert testimony that a particular witness has testified truthfully. The former type is admissible; the latter type is not. "[T]here is a critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility." (Internal quotation marks omitted.) *State* v. *Borrelli*, 227 Conn. 153, 173, 629 A.2d 1105 (1993).

Viewed in its entirety, Johnson's testimony provided probable explanations for the victim's conduct. These explanations were based on Johnson's training and experience. "Such explanatory testimony does not invade the province of the jury in assessing the credibility of witnesses. . . . Furthermore, it is not impermissible for an expert witness to respond to hypothetical questions about the behavior of abuse victims for the purpose of establishing that the victim's behavior was generally consistent with that of such victims." (Citation omitted.) *State* v. *Yusuf*, 70 Conn. App. 594, 620, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002). Johnson did not testify that the victim was

credible or that she had been sexually abused. As was the case in *Freeney*, "[t]he sole purpose of the [expert's] testimony was to establish that the victim's behavior was generally consistent with that of a victim of sexual . . . abuse." *State* v. *Freeney*, supra, 228 Conn. 592.

The fact that the prosecutor asked a number of hypothetical questions that tracked the facts of this case does not lead us to conclude that Johnson opined that the victim was credible. That the questions tracked the facts of this case bolstered their relevance, and in each hypothetical question Johnson was asked merely to compare the hypothetical victim's conduct to that of a typical sexual assault victim. The questions did not call on Johnson to opine that the victim either was credible or was a victim of any crime. The questions called on Johnson to evaluate whether the victim's conduct was uncommon or unusual as compared to that of other victims of sexual abuse. Johnson did not testify that he had treated the victim or had even met the victim. Rather, he testified that his knowledge of the case was limited to the facts contained in the state's hypothetical questions. The defendant availed himself of his right to cross-examine Johnson regarding his expert opinions. Johnson testified during cross-examination that in his learning and experience, it was certainly possible that a sexual assault complainant could lie about abuse or, believing them to be true, falsely report incidents of abuse. Additionally, the court instructed the jury that the expert testimony was not binding on the jury but subject to its scrutiny.[14] Accordingly, we are not persuaded that the testimony unfairly bolstered the victim's credibility.

[14] After recalling the names of the expert witnesses who testified at trial, the court delivered the following instruction in its jury charge: "[N]o matter what may be the expertise of a particular witness who states to you an opinion about a fact in a case, that opinion is subject to review by you. It is in no way binding upon you. It is for you to consider along with the other circumstances in the case and, using your best judgment, to determine whether you will give any weight to it and, if so, what weight you will give to it. In weighing and considering the testimony of an expert, you should

### III

Finally, the defendant claims that the court improperly failed, following an in camera review of the victim's medical records, to disclose fully to him material information from such records. We disagree.

The record reflects the following additional relevant facts. Prior to trial, the defendant filed a motion for review and disclosure of certain mental health records of the victim. The records at issue related to psychological treatment the victim had received after she began her relationship with the defendant. These records were delivered to the court pursuant to a subpoena issued by the state. The defendant requested that copies of such records be made available to the defense or that the court conduct an in camera review of such records for the purpose of disclosing to the defense any records that would be relevant to the defense for the purpose of cross-examining the victim. During argument on the motion, the defendant's attorney argued that the records at issue pertained to the victim's psychological treatment and that the defense was interested in the disclosure of any records that pertained to (1) the victim's bias, interest or motive in bringing complaints against the defendant, (2) any treatment, such as medications, prescribed for the victim that would affect her ability to perceive or recollect facts or (3) any inconsistent statements by the victim relating to the subject

---

apply to them the same considerations of credibility that you apply to any other witness, such as their appearance and demeanor on the [witness] stand, their interest in the outcome of the case, their ability to recall and relate facts to you, and all the other considerations you use in judging the believability of other witnesses. In addition, when deciding the weight to be accorded the testimony of an expert witness, you should also consider their education and experience and their ability in the particular field of knowledge and any other material facts of the sort developed in the course of their testimony. You should consider the proof or lack of proof, the completeness or lack of completeness, of any facts considered by the expert in forming his or her opinion, and you should evaluate this expert testimony in light of these principles that I've just discussed with you."

matter of this case, such as claims by the victim that another person committed the crimes at issue.

The court granted the motion, agreeing to conduct an in camera review of the records at issue. The court stated: "[T]hings that . . . appear in the records that I think fairly go to the witness' ability to observe, recall and relate I'll disclose; other records that may fall in some kind of exculpatory or inconsistent statement . . . if it's clear to me they should be disclosed, I'll disclose them right away." The court noted that it would use its best judgment in fairly disclosing appropriate records. Subsequently, the court revisited the defendant's request after reviewing the records at issue. The court deemed some of the records to be discoverable and provided such records to the defense. The court ordered the remaining records to remain under seal. The court properly marked these sealed records as a court exhibit, and they remained in the court file for the purpose of appellate review. See Practice Book § 62-10; *State* v. *Webb*, 75 Conn. App. 447, 461 n.9, 817 A.2d 122 (discussing proper procedure to be followed by trial court with regard to sealing nondiscoverable privileged records following in camera review of such records), cert. denied, 263 Conn. 919, 822 A.2d 244 (2003).

The defendant characterizes his claim in terms of the court's having improperly failed to disclose records to the defense. It is clear, however, that the defendant invites this court to conduct an in camera review of the psychiatric treatment records remaining under seal for the purpose of determining whether the court abused its discretion in failing to disclose additional records to the defense.

"We have stated that a trial court, upon inspecting such records in camera, must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate

relevant occurrences. . . . If the court determines that the records are probative, the state must obtain the witness' further waiver of his privilege concerning the relevant portions of the records for release to the defendant, or have the witness' testimony stricken. If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused. . . . [A]ccess to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records . . . . [T]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 490, 886 A.2d 777 (2005).

We have carefully reviewed the sealed records. On the basis of that review, we agree with the trial court that the undisclosed records do not contain exculpatory evidence, impeachment evidence or evidence relating to the victim's capacity or credibility as a witness. The court aptly described its role in reviewing these records, and our review of the records reflects that the court properly exercised its discretion in denying the defendant access to the limited portion of the records that it kept under seal.

The judgment is affirmed.

In this opinion the other judges concurred.