******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RAFAEL CRESPO *v.* COMMISSIONER
OF CORRECTION
(AC 35372)

Lavine, Alvord and Schaller, Js.

*Argued October 22, 2013—officially released March 25, 2014*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Adrienne Maciulewski*, deputy assistant state's attorney, for the appellant

(respondent).

*Hilary Carpenter*, assistant public defender, with whom, on the brief, was *Carolyn Trotta*, legal intern, for the appellee (petitioner).

*Opinion*

SCHALLER, J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting the third amended petition for a writ of habeas corpus filed by the petitioner, Rafael Crespo. On appeal, the respondent claims that the habeas court, in concluding that the petitioner was deprived of his right to the effective assistance of counsel, improperly determined that his trial counsel's deficient performance was prejudicial. We agree with the respondent and, accordingly, reverse the judgment of the habeas court.

In the underlying criminal matter, the petitioner was charged with four counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), two counts of assault in the third degree in violation of General Statutes § 53a-61 (a) (1), and one count of kidnapping in the second degree in violation of General Statutes § 53a-94. Following a jury trial, he was convicted of two counts of sexual assault in the first degree and one count of assault in the third degree.[1] This court affirmed the judgment of conviction on direct appeal. *State* v. *Crespo*, 114 Conn. App. 346, 969 A.2d 231 (2009), aff'd, 303 Conn. 589, 35 A.3d 243 (2012). In doing so, this court determined the jury reasonably could have found the following facts.

"The [petitioner] met the victim during the summer of 2002, and the two began dating. At times relevant, the [petitioner] was a police officer and the victim was a college graduate student. In the months prior to December, 2002, the two engaged in sexual activities together, but this conduct did not include vaginal or anal intercourse. In December, 2002, the [petitioner] forcibly engaged in vaginal intercourse with the victim but, prior to this sexual encounter, she had been a virgin. On February 4, 2003, the victim sought medical attention at a college health clinic. Although the victim reported to a nurse that she had been raped, the victim declined to report the incident to the police. The victim believed that if she were to report the incident, the [petitioner's] status as a police officer would protect him and that he would retaliate against her.

"Following this incident, the victim's physical and psychological well-being suffered. The victim took steps to distance herself from the [petitioner]. For example, on several occasions she did not return the [petitioner's] telephone calls or e-mails. The [petitioner] persisted in his efforts to continue the relationship by calling and e-mailing the victim. Also, he appeared uninvited at both her residence and place of employment. Nonetheless, the victim's relationship with the [petitioner] continued, and she accepted favors and gifts from the [petitioner] and, on occasion, accepted his invitations to dinner and the like. The [petitioner's] rela-

tionship with the victim, however, was characterized by violent outbursts. During an incident in March, 2003, the [petitioner] unexpectedly visited the victim at her residence. The [petitioner] angrily accused the victim of making herself look good so that she could attract other men. The [petitioner] called the victim a slut and physically assaulted her by punching her and pulling her hair. The [petitioner] told the victim that he wanted to end their relationship, yet the [petitioner] thereafter contacted the victim. The [petitioner] repeatedly threatened the victim, both implicitly and explicitly, with physical violence. Although the victim feared the [petitioner], she continued to spend time with him, often in public settings, and did not report any incidents of abuse to law enforcement personnel.

"In June, 2003, the victim returned to Connecticut from a family engagement in another state. The [petitioner] had instructed the victim to call him while she was away, but the victim had called him only once. When the victim arrived at the airport, the [petitioner] was waiting there for her and, taking her by the hand, angrily led her away from the airport. The [petitioner] drove the victim to her residence. Upon accompanying the victim inside, the [petitioner] played the messages that had been left on the victim's telephone answering machine while she was away. Consequently, the [petitioner] heard a message left for the victim from a man who had met the victim at a local nightclub. The caller indicated that he thought the victim was attractive and that he wanted to see her again.

"Upon hearing this message, the [petitioner] became irate. The [petitioner] physically assaulted the victim by slapping the victim's face, pulling her hair, punching her, kicking her and knocking her to the floor. The [petitioner] called the man who had left the message for the victim; he argued and yelled at him while the victim pleaded for the [petitioner] to stop.

"After the [petitioner] ended the telephone conversation, he continued his physical assault of the victim. Despite her protests, the [petitioner] hit, kicked and punched the victim about her body while yelling at her and calling her a whore. The [petitioner] punched the victim in the face and knocked her to the floor. Thereafter, the [petitioner] forcibly removed the victim's clothing and vaginally raped her. Following the sexual assault, the [petitioner] left the residence. The victim reported this assault to her mother but not to the police. Shortly after this incident, the [petitioner] sent the victim an e-mail in which he expressed his intent to stop interacting with the victim. Nevertheless, the [petitioner] later resumed having contact with the victim.

"On May 15, 2004, the [petitioner] drove to the victim's place of employment, and the victim permitted the [petitioner] to take her shopping and to a movie. The [petitioner] drove the victim to a shopping mall,

where he purchased undergarments for her. Later, while the two were watching a movie, the [petitioner] became upset with the victim and hastily left the movie theater. The victim left the theater with the [petitioner] in his automobile. Following a dispute over the victim's sunglasses, the [petitioner] became more and more agitated while driving the victim home. He began striking his steering wheel and was brandishing a gun. The [petitioner] drove his automobile into a parking lot where he began to beat the victim. The victim exited the automobile, but the [petitioner] pursued her and continued to strike her. The [petitioner] kicked the victim, causing her to fall to the ground. Among her injuries, the victim sustained a significant elbow injury. When the victim was unable to rise from the pavement, the [petitioner] drove away from the scene. Several minutes later, the [petitioner] returned and forced the victim into the automobile by pulling her hair and pushing her into the passenger seat.

"The victim told the [petitioner] that she did not want others at her college residence to see her in the condition that she was in. At her suggestion, the [petitioner] drove her to his parents' home, where the victim stayed for several days. Thereafter, the [petitioner] and his father drove the victim back to her place of employment. In the following days, the victim sought treatment for her injuries from medical personnel at her college. At this time, the victim suffered emotionally, and her physical injuries ranged from the injury to her elbow to dehydration. The victim told a nurse and a physician that her boyfriend had beaten and sexually assaulted her. An administrator at the victim's college also became aware of the victim's condition as well as the victim's concern for her safety. As a result, the victim moved into a more secure dormitory at the college. Despite discussing her claims of abuse with these individuals associated with her college, the victim declined to report the incidents of abuse to the police.

"In mid-June, 2004, on the victim's birthday, the [petitioner] called the victim at her place of employment approximately fifty times. The victim agreed to go to dinner with the [petitioner]. After dinner, the two returned to the victim's residence. The [petitioner], who was cordial during the date until this time, became irritable. He removed his clothing, accused the victim of staining his shirt during dinner and demanded that she clean the shirt. Upon the victim's refusal, the [petitioner's] anger escalated, and he became verbally abusive. Then, the victim and the [petitioner] engaged in consensual vaginal intercourse. Afterward, the [petitioner] forcibly engaged in anal intercourse with the victim against her will. The [petitioner] later left the victim's apartment while she was showering.

"The [petitioner] and the victim remained in contact following this incident. By November, 2004, the victim

had taken steps to end the relationship despite the [petitioner]'s efforts to continue the relationship. In December, 2004, the victim reported the incidents of abuse to a police officer. The [petitioner]'s arrest followed." (Footnotes omitted.) Id., 348–53.

Following his unsuccessful direct appeal, the petitioner brought this petition for a writ of habeas corpus, claiming, inter alia, that his trial counsel, Robert Pickering, was ineffective in failing to investigate and present at trial the testimony of Jeffrey Cruz, a witness who would have impeached the testimony of the victim.

Cruz, a lifelong friend of the petitioner, was referenced in the underlying criminal trial through the victim's testimony regarding an incident of uncharged misconduct.[2] Specifically, during presentation of the state's case-in-chief, the victim testified that the petitioner physically assaulted her at Cruz' New Jersey residence in February, 2004. In her specific testimony concerning the incident of uncharged misconduct, the victim related the following sequence of events. The victim and the petitioner had traveled to New Jersey to stay with Cruz on or about February 14, 2004, with the intention of staying for the weekend. One morning during their stay, an argument occurred between the victim and the petitioner in a second floor bedroom. In the midst of their argument, the petitioner punched the victim in the face causing her to fall to the floor near the bedroom door. He then slammed her hand with the door and left the residence. The victim, with visible bruises and cuts on her face, then went downstairs where she encountered Cruz. Cruz had heard the fighting and demanded to know what happened. Before the victim could explain, Cruz noticed the victim's physical injuries. He then asked her to leave or cover her injuries with cosmetics. After telling him that she had nowhere to go, Cruz and the victim talked "for a few hours." During their discussion, Cruz told the victim that "this is how [the petitioner] treats women . . . you need to break off the relationship and get out of it . . . [the petitioner] treats women like dogs." The petitioner, testifying in his own defense during the criminal trial, denied assaulting the victim in New Jersey. Cruz was never presented as a witness during trial.[3]

During the habeas trial, Cruz offered a different account of what occurred during the petitioner's and victim's February, 2004 visit to his residence. Cruz testified that he observed the petitioner exit his residence through the backdoor one morning. About five seconds later, he stopped the victim, who was "going after" the petitioner, because he wanted to avoid an argument occurring outside of his residence. He denied hearing any argument before the victim came downstairs and also denied observing any injuries, bruising, or cuts on the victim's body. In addition, he testified that he did not tell the victim that the petitioner mistreated women,

treated them like "dogs," and that his conversation with her could not have lasted more than "two or three minutes."

The habeas court determined that Pickering's failure to present the testimony of Cruz constituted deficient performance and, but for such failure, there existed "a reasonable likelihood that the outcome of the petitioner's criminal trial would have been different . . . ."[4] The court granted the petition, vacated the petitioner's conviction, and remanded the case for a new trial. This appeal followed.[5] Additional facts and procedural history will be set forth as necessary.

As a preliminary matter, we set forth the applicable standard of review and relevant principles of law that will guide our analysis. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* . . . [i]t is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. . . . The claim will succeed only if both prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 510, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

In the present case, the respondent concedes that the habeas court properly determined that Pickering's failure to present Cruz as a witness during the petitioner's criminal trial constituted deficient performance. The respondent's only claim on appeal is that the court improperly applied *Strickland*'s prejudice prong in concluding that, but for Pickering's deficient performance, there was a reasonable probability that the outcome of the underlying criminal trial would have been different.

In order to satisfy the prejudice prong, "the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [T]he question is whether there is a reasonable probability that, absent the [alleged] errors, the [fact finder] would have had a reasonable doubt respecting guilt. . . .

"In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or the jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 688–89. We note, however, that "the [*Strickland*] principles . . . do not establish mechanical rules. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case [we] should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland* v. *Washington*, supra, 466 U.S. 696.

In support of its claim that the court's application of *Strickland*'s prejudice prong was fundamentally flawed, the respondent contends that the court failed to consider the totality of the evidence before the jury. Specifically, the respondent contends that "the state presented substantial independent evidence corroborating the victim's testimony that the petitioner sexually and physically assaulted her, which the habeas court improperly failed to consider" in determining that Pickering's failure to present Cruz as a witness was reasonably probable to produce a different result in the petitioner's criminal trial. We agree.[6]

The impact that Cruz' "ostensibly credible" testimony likely would have had on the jury's verdict in the underlying criminal trial "must be considered in light of all of the evidence that was before the jury." *Griffin* v. *Commissioner of Correction*, 98 Conn. App. 361, 367, 909 A.2d 60 (2006). "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 689.

Our review of the criminal trial record reveals that

the February, 2004 incident of uncharged misconduct was "admitted only insofar as it [was] relevant to the relationship between the [victim] and the [petitioner]."[7] "It is well established that [t]he jury is presumed, in the absence of a fair indication to the contrary, to have followed the court's instructions." (Internal quotation marks omitted.) *William C.* v. *Commissioner of Correction*, 126 Conn. App. 185, 190–91, 10 A.3d 115, cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011); see *Strickland* v. *Washington*, supra, 466 U.S. 695 ("[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision"). Even assuming, arguendo, that the jury would have fully credited Cruz' testimony and discredited the victim's testimony with respect to the February, 2004 incident of uncharged misconduct, we cannot conclude on the record before us that Pickering's failure to present Cruz "likely would have permeated to some degree every aspect of the trial and raised a reasonable doubt in the minds of the [jurors] as to the petitioner's guilt." *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 523.

To begin with, the state presented evidence independent of the victim's testimony with respect to each offense for which the petitioner was convicted. Turning first to the June, 2003 incident and the corresponding conviction of sexual assault in the first degree, the jury heard the testimony of the victim's mother, who testified that the victim called her shortly after the petitioner had beaten and raped her in June, 2003. In addition, the jury was presented with e-mails sent by the petitioner to the victim shortly after the incident, as well as e-mails the victim's mother sent to the police after receiving the telephone call from the victim. With respect to the May, 2004 incident and the corresponding conviction of assault in the third degree, the jury heard the testimony of Judith Hlawitschka, a physician, who testified that she had examined the victim and found that the victim had suffered physical injuries consistent with being knocked to the ground and dragged. In addition, the jury heard testimony from a dean of the victim's college. The dean testified that he met with the victim in May, 2004, and thought it necessary to facilitate the victim's move to a dormitory on campus in light of her safety concerns. Finally, regarding the June, 2004 incident and corresponding conviction of sexual assault in the first degree, the jury heard the testimony of Dennis Murphree. Murphree testified that he encountered the victim in the street following the alleged sexual assault, found her crying uncontrollably, and she "had a very stiff walk just like a penguin." In addition, the jury was presented with several e-mails the petitioner sent to the victim the day following the June, 2004 incident.

The state also presented the testimony of Samuel

Flores and Nana Duffie Addo, who independently corroborated the petitioner's aggressive behavior toward the victim. Flores testified that he and the petitioner argued over the telephone in June, 2004. The telephone call ended with the petitioner announcing his intention to confront Flores. Thereafter, the petitioner called Flores' place of employment and left aggressive messages with Flores' colleagues. Addo testified that she witnessed the petitioner punch doors in the victim's apartment when Addo, who was staying with the victim at the time, refused to leave upon his arrival. In addition, Addo testified that the petitioner acted rather "irrational." The testimony of Flores and Addo removes the evidence concerning the nature of the relationship between the petitioner and the victim from the realm of a mere credibility contest. The jury also heard the testimony of the petitioner's former supervisor, Sergeant Kenith Smith of the East Windsor Police Department. Smith testified that the petitioner demonstrated aggression toward him in a manner akin to the testimony of the victim, Flores, and Addo.[8]

In contrast to the evidence presented at trial, however, stands the habeas court's limited summary thereof: "[T]he trial evidence pitted the victim's testimony against the petitioner's. Neither person had a previous criminal record. Both were employed in respectable careers. The petitioner was a police officer, and the victim was a graduate student in physics. Forensic evidence played no important role in the case. Instead, constancy of accusation and medical and psychological evidence regarding signs of abuse predominated to corroborate the victim's allegations." Moreover, the court found that Cruz' testimony "directly refutes testimony by the victim which portrayed the petitioner as abusive to women even in the eyes of the petitioner's closest friend." Even if the jury fully credited Cruz' testimony in this regard, his testimony would have impeached the victim's testimony of events only with respect to the incident of uncharged misconduct. His testimony would not tend to refute the testimony of the victim's mother concerning the June, 2003 sexual assault, the testimony of Hlawitschka and the dean of the victim's college concerning the May, 2004 assault, the testimony of Murphree concerning the June, 2004 sexual assault, and the e-mails relating to all of the foregoing incidents. Moreover, Flores, Addo, and Smith testified that the petitioner displayed aggressive behavior toward them, just as the victim had described that the petitioner was aggressive toward her.[9]

In light of the foregoing, we conclude that the introduction of Cruz' testimony to the body of evidence presented at trial would have "had an isolated, trivial effect." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 689. As stated previously, the impact Cruz' "ostensibly credi-

ble" testimony likely would have had on the jury's verdict in the underlying criminal trial "must be considered in light of *all of the evidence* that was before the jury." (Emphasis added.) *Griffin* v. *Commissioner of Correction*, supra, 98 Conn. App. 367. In the present case, the habeas court's limited view of the trial evidence inhibited its application of *Strickland*'s prejudice prong. The state's body of evidence was not, as argued by the petitioner and set forth by the habeas court, directly predicated on the victim's credibility.

Although we recognize that Cruz' testimony *could* have affected the trial to some degree, *Strickland* expressly requires the petitioner to demonstrate that, absent counsel's error, the *result* of the trial *would* have been different. Cruz' testimony related to an incident of uncharged misconduct that played a relatively minor role in the petitioner's criminal trial.[10] Notwithstanding the habeas court's determination that Cruz was "ostensibly credible," he undoubtedly would have been subject to impeachment. Even if fully credited by the jury, however, his testimony would not undermine the independent testimony and evidence presented by the state to support the charges for which the petitioner was convicted. In sum, if Cruz' testimony was presented at trial, it was not reasonably probable that the outcome would have been different. See *Harrington* v. *Richter*,      U.S.      , 131 S. Ct. 770, 792, 178 L. Ed. 2d 624 (2011) ("the likelihood of a different result *must be substantial* not just conceivable" [emphasis added]). Accordingly, we conclude that the petitioner failed to establish that he was prejudiced by Pickering's failure to present Cruz as a witness at the criminal trial.

The judgment is reversed and the case is remanded with direction to render judgment denying the amended petition for a writ of habeas corpus.

In this opinion the other judges concurred.

[1] "The jury returned a not guilty verdict with regard to a count of kidnapping in the second degree as well as two additional counts of sexual assault in the first degree. The jury returned a guilty verdict with regard to an additional count of assault in the third degree, but the [trial] court later dismissed this count prior to sentencing. The court imposed a total effective term of incarceration of twenty-six years, execution suspended after fourteen years, followed by a fifteen year term of probation." *State* v. *Crespo*, 114 Conn. App. 346, 348 n.1, 969 A.2d 231 (2009), aff'd, 303 Conn. 589, 35 A.3d 243 (2012).

[2] During trial, the trial court granted the petitioner's motion for notice of uncharged misconduct. The petitioner, however, did not object to evidence of the February, 2004 incident or any other specific instance of uncharged misconduct.

[3] During the habeas trial, the petitioner testified that he met with Pickering the Saturday before the start of the criminal trial. During this meeting, both Pickering and the petitioner reviewed police reports obtained through discovery. One of the police reports referenced the February, 2004 incident between the petitioner and the victim that occurred while both were staying with Cruz. The petitioner explained the nature of the incident to Pickering, informed him that Cruz could corroborate his version of events, and asked him to call Cruz as a witness. Pickering, however, did not present Cruz as a witness during the criminal trial.

[4] The habeas court later specified that it used "reasonable likelihood" and "reasonable probability" as synonyms.

[5] The habeas court granted the respondent's petition for certification to appeal from its judgment.

[6] The respondent, relying on *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 510, and *Sanchez* v. *Commissioner of Correction*, 138 Conn. App. 594, 600, 53 A.3d 1031 (2012), cert. granted, 307 Conn. 951, 58 A.3d 976 (2013), contends that the court improperly "discounted" Cruz' "obvious bias" as the petitioner's lifelong friend in applying *Strickland*'s prejudice prong. In light of our conclusion that the court improperly failed to consider the totality of the evidence presented at trial for purposes of assessing prejudice under *Strickland*, we need not address this argument.

[7] The trial court instructed the jury that evidence of uncharged misconduct "was not admitted to prove the bad character of the [petitioner] or the [petitioner's] tendency to commit criminal acts. In other words, you may not consider such evidence as establishing a predisposition on the part of the [petitioner] to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider this evidence, if you believe it, only if you find that it is probative of the relationship between the [victim] and the [petitioner]. On the other hand, if you do not believe this evidence or even if you do, if you find that it is not probative of their relationship, then you may not consider this evidence for any purpose."

[8] Specifically, the petitioner threatened to "tear off" Smith's head and "shit down" his neck.

[9] The petitioner nevertheless argues that Cruz' testimony would have impeached the victim's credibility entirely and, by extension, would have called into question the testimony of the state's witnesses insofar as their testimony was based solely on the victim's reports to them. This argument must fail as the trial court instructed the jury that the incident of uncharged misconduct, as related by the victim in her testimony, was relevant only to "the relationship between the [victim] and the [petitioner]." See *Strickland* v. *Washington*, supra, 466 U.S. 695 (petitioner not entitled to "luck" that jury would not have followed instructions). If it were the case that Cruz' testimony, if offered at trial, likely would have refuted the victim's testimony with respect to the uncharged misconduct, we cannot say it would have also functioned to refute either her testimony concerning the charges against the petitioner or the entirety of the state's evidence. "[N]ot every error that *conceivably* could have influenced the outcome undermines the reliability of the result of the proceeding." (Emphasis added.) *Strickland* v. *Washington*, supra, 466 U.S. 693.

[10] Indeed, our review of the record reveals that the February, 2004 incident of uncharged misconduct was only referred to during the victim's testimony and briefly during the state's closing argument.