******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TRENDEL TUTSON *v.* COMMISSIONER
OF CORRECTION
(AC 37939)

DiPentima, C. J., and Sheldon and Bear, Js.

*Argued April 4—officially released September 6, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Oliver, J.)

*Michael D. Day*, with whom, on the brief, was *John
J. Duguay*, for the appellant (petitioner).

*Michele C. Lukban*, senior assistant state's attorney,
with whom, on the brief, were *Gail P. Hardy*, state's
attorney, and *David M. Carlucci*, assistant state's attor-
ney, for the appellee (respondent).

*Opinion*

DiPENTIMA, C. J. The petitioner, Trendel Tutson, appeals from the judgment of the second habeas court, *Oliver*, *J.*, denying his second amended petition for a writ of habeas corpus. The petitioner claims that the second habeas court erred by (1) concluding that there was no reasonable probability that the result of the habeas appeal from the first habeas court's denial of his petition for certification to appeal would have been different and (2) declining to presume that the petitioner was prejudiced by his prior habeas appellate counsel's failures to raise an issue on his petition for certification to appeal from the first habeas court's ruling. We affirm the judgment of the second habeas court.

The petitioner was charged with attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a, and assault in the first degree in violation of General Statutes § 53a-59 (a) (5), for his role in a shooting that took place between 1 and 1:30 p.m. on March 26, 2001, in Hartford. In order to resolve the issues in this appeal, we revisit relevant facts concerning the petitioner's alibi witnesses who testified at his trial as set forth in *State* v. *Tutson*, 278 Conn. 715, 899 A.2d 598 (2006). Approximately eight months before the petitioner's trial commenced, "[o]n August 6, 2001, the [petitioner's trial counsel] sent a letter to the state . . . identifying Julia Thomas (Julia) as the only alibi witness. The letter contained no information, however, regarding the [petitioner's] whereabouts at the time the crime was committed. The [petitioner's trial counsel] also provided the state with a three page investigative report dated April 19, 2001. The report was based on a personal interview with Julia and a telephone interview with her son, Terrell Thomas (Terrell). Although the report referred to the [petitioner's] 'girlfriend' and listed the name of Rooty [Thomas (Rooty)] as a subject to be interviewed, it did not name Rooty as a prospective witness and did not identify her as the [petitioner's] girlfriend.

"The trial commenced on March 11, 2002. The state alleged that the [petitioner] was guilty as a principal or an accessory of criminal attempt to commit murder and assault in the first degree. In the bill of particulars . . . the state specifically alleged that, '[o]n [March 26, 2001], at approximately 1:30 p.m., the [petitioner] was the operator of a 1997 white Dodge Neon proceeding east on Bond Street' and that '[Philip] Washington was his front seat passenger in the . . . Neon.' The state further alleged that the [petitioner] had engaged in a car chase with [Ernesto] Molina, who was driving a red Volkswagen Jetta carrying two other passengers, [Jorge Pagan and one other individual], and had fired a shot at the Jetta, or had assisted Washington in shooting at the Jetta, thereby causing physical injury to Molina.[1] The [petitioner], relying on theories of misidentification

and alibi, attempted to convince the jury that the two eyewitnesses to the shooting [Molina and Pagan] incorrectly had identified him as the perpetrator because, at the relevant time, he was in another location and thus could not have committed the alleged offenses.

"As the state was nearing the end of its case-in-chief, [the petitioner's trial counsel] represented to the court, outside the presence of the jury, that she had given the state the names of Julia and her sons, Terrell and Tyrone Thomas (Tyrone), as alibi witnesses. An extended discussion followed as to whether the [petitioner] had provided the state with adequate notice to admit the proposed alibi testimony . . . .

"During this discussion, [the petitioner's trial counsel] declared that the [petitioner's] 'strongest' alibi witness was Rooty. When the state protested that it had not been given notice that Rooty would testify as an alibi witness, [the petitioner's trial counsel] replied that she had included Rooty on the defense witness list, although counsel was having difficulty locating her. Upon further inquiry by the court, [the petitioner's trial counsel] stated that if Rooty could be located and was allowed to appear as an alibi witness, she would testify that she and the [petitioner] went to New Haven following his visit with Terrell to pick up her child or drop off her nephew. . . .

"That same day, prior to the testimony of the state's final witness, the [petitioner's trial counsel] filed the following notice of alibi with the court: '[O]n the date of [March 26, 2001] at approximately [1] and 1:20 [p.m.], the [petitioner] . . . was at the home of . . . Julia . . . and Tyrone . . . located at 827 Wethersfield Avenue, Hartford . . . .

" '[O]n [March 26, 2001] at approximately 1:20 until [3 or 4 p.m.], the [petitioner] . . . was in the company of Terrell . . . and Rooty . . . (who are not related to each other) [en] route to and from Meriden and New Haven . . . where Rooty . . . had to pick up her . . . child from school.'

"After the state concluded its case-in-chief, [the petitioner's trial counsel] reiterated to the court, outside the presence of the jury, that if Rooty was located and permitted to appear as an alibi witness, she would testify that the [petitioner] left Julia's residence at approximately 1:20 p.m. on the day of the shooting and accompanied her to Meriden and New Haven to pick up her child. . . .

"The following day, [the petitioner's trial counsel] informed the court that she finally had located Rooty, who would be available to testify later that day. The court replied that, because [the petitioner's trial counsel] had failed to comply with the applicable rules of practice, it would allow Rooty to testify as an alibi witness only if the state was given an opportunity to

interview her first. [The petitioner's trial counsel] initially agreed to this proposal but then informed the court that she no longer wanted to offer Rooty as an alibi witness because she had learned that Rooty was not with the [petitioner] at the time of the shooting. The court responded that, in those circumstances, the [petitioner's trial counsel] had 'an absolute right' to call Rooty as a regular witness.

"Thereafter, Julia testified in a manner generally consistent with the investigative report, stating that the [petitioner] was visiting her sons, Terrell and Tyrone, when she returned home from grocery shopping between 12:30 and 1 p.m. on the day of the shooting and that he left at approximately 1:10 to 1:15 p.m. She further testified that the [petitioner] had stated upon leaving that his girlfriend was waiting outside in her car. Julia described the vehicle, which she had seen when returning to her residence a short time earlier, as a small white car with a child inside.

"Rooty subsequently testified that she drove the [petitioner] to Julia's residence to visit his friend Terrell between 12:30 and 1 p.m. on the day of the shooting. Before she could testify further, however, the state objected, outside the presence of the jury, to further questioning of Rooty because it appeared that she was about to give alibi testimony. [The petitioner's trial counsel] responded that Rooty was going to testify that, after she dropped the [petitioner] off at Julia's residence, she left the area and returned to pick him up around 2 p.m.[2] When the court noted the conflict between the proffered testimony and Julia's testimony that the [petitioner] had left her residence shortly after 1 p.m., the [petitioner's trial counsel] responded that Rooty was not an alibi witness because she would not be testifying as to what the [petitioner] did between the time she dropped him off and the time she picked him up.

* * *

"After Rooty returned to the stand, [the petitioner's trial counsel] did not inquire further regarding her activities after she dropped the [petitioner] off at Julia's residence.

"In the proceedings that followed, the state elicited rebuttal testimony from Detective Andrew Weaver of the Hartford police department that Rooty had stated in an interview that was conducted shortly after the crime was committed that the [petitioner] had asked her if he could use her Neon on the morning of March 26, 2001, that she had assented to his request and that she was unaware of the location of the vehicle until Weaver had contacted her after the shooting. . . . In accordance with [a request from the petitioner's trial counsel], the court thereafter gave an alibi instruction that the [petitioner] claimed he was elsewhere at the

time of the alleged offenses.

"At the conclusion of the trial, the jury found the [petitioner] guilty of attempt to commit murder and assault in the first degree. The court rendered judgment in accordance with the jury verdict and sentenced the [petitioner] to twenty years incarceration." (Citation omitted; footnotes altered.) Id., 721–30.

On direct appeal, this court reversed the judgment of the trial court and remanded the case for a new trial because it concluded that the trial court had violated the petitioner's right to present a defense. *State* v. *Tutson*, 84 Conn. App. 610, 627–28, 854 A.2d 794 (2004). Our Supreme Court reversed the judgment of this court with direction to consider additional claims that this court did not resolve. *State* v. *Tutson*, supra, 278 Conn. 751. Following that remand, this court affirmed the judgment of conviction. *State* v. *Tutson*, 99 Conn. App. 655, 656, 915 A.2d 344 (2007).

Thereafter, the petitioner filed his first petition for a writ of habeas corpus and was represented by Attorney Rebecca I. Bodner. Count one of his amended petition dated February 23, 2010, alleged ineffective assistance of counsel. The petitioner contended that his trial counsel failed, inter alia, "to pursue an adequate alibi defense . . . to file a formal notice of alibi . . . [and] to recognize the testimony of Rooty . . . as alibi testimony . . . ."

On May 20, 2010, Rooty testified before the first habeas court, *Fuger, J.* On direct examination, Rooty testified that at approximately 12 p.m. on the day of the shooting, her sister called, requesting her to pick up Rooty's nephew in New Haven. According to Rooty, she received this call when she and the petitioner were visiting friends in Hartford. Because Rooty felt ill, the petitioner drove the vehicle to New Haven. Rooty also testified that the petitioner's friend, "Rel," accompanied them. After picking up her nephew in New Haven, Rooty testified that they all returned to Meriden. Rooty also testified that, prior to testifying at the petitioner's criminal trial, she spoke with his trial counsel:

"[The Petitioner's Habeas Counsel]: So, did you meet with [the petitioner's trial counsel] prior to testifying?

"[Rooty]: Briefly because I was late. . . .

"[The Petitioner's Habeas Counsel]: For how long did this meeting last?

"[Rooty]: I'd say about ten minutes.

"[The Petitioner's Habeas Counsel]: Okay. What did you talk about?

"[Rooty]: She basically briefed me on the trial, let me know that he would be present, and she gave me what his charges were, and that's really about it. She asked me if I [could] recollect anything about that day, and I

told her that I really just didn't know besides telling her that we spent a lot of time together, so, as far as the exact date of everything that happened, that so much had happened in my life, I couldn't really recall that."

Furthermore, Bodner sought to clarify whether Rooty had "ever [told the petitioner's trial counsel] that [the petitioner] was not driving with [her] on that day." Rooty responded, "I don't remember telling [the petitioner's trial counsel] that," but agreed with Bodner that she had told the petitioner's trial counsel "basically what [she] testified to" at the habeas trial.

On cross-examination, counsel for the respondent, the Commissioner of Correction, pressed Rooty on her recollection of the timeline of March 26, 2001. After testifying that she had picked up her nephew at "approximately one something," Rooty was asked whether she and the petitioner left Hartford en route to New Haven at approximately 12:30 p.m. Rooty responded, "Approximately." The following colloquy ensued:

"[The Respondent's Counsel]: Okay. And what time did your sister call you?

"[Rooty]: No, not to leave them at 12:30 p.m. I received a phone call around that time, and yeah, that's when we left, around one to get down there.

"[The Respondent's Counsel]: Okay. You left around one to get to New Haven, correct?

"[Rooty]: I'd say. I mean not to—I don't want to perjure myself, but when it comes to when I received the call, as soon as I received the call, I left. So, when my sister called me, as I testified before, it was about two hours before my nephew was even supposed to get out of school, and he's supposed to get out of school between, around 2:30 p.m.

"[The Respondent's Counsel]: So, you would have gotten a call around 12:30 p.m., correct?

"[Rooty]: Yes, ma'am.

"[The Respondent's Counsel]: And you immediately left with [the petitioner] and drove to New Haven, correct?

"[Rooty]: I'd say give or take ten to fifteen minutes because we were waiting on his friend to come downstairs. He was handling some business with his mother. His mother had called him upstairs as he was leaving. We went upstairs, and we waited for him, and then we took off.

"[The Respondent's Counsel]: Okay. Now, after [the petitioner] changed his clothes in Windsor, you went immediately to his friend's house?

"[Rooty]: I believe so.

"[The Respondent]: Okay. Well, didn't you testify in

2002 that you then went to the doctor's office for forty-five minutes?[3]

"[Rooty]: Well, as the—as I testified, the dates that were being thrown at me, and things that had happened had gotten my days misconstrued. So, I told that to [the petitioner's habeas counsel] and everyone else that questioned me and asked me about these events." (Footnote added.)

In an oral ruling, later memorialized pursuant to Practice Book § 64-1 (a), the first habeas court rejected the petitioner's claim of ineffective assistance of trial counsel without explicitly finding deficient performance by the petitioner's trial counsel. Specifically, the habeas court found that although it "appear[ed] that [the petitioner's trial counsel] may have been guilty of . . . deficient performance in not filing an appropriate notice of alibi defense, it's crystal clear that such failure did not operate to the prejudice of the petitioner."

After the first habeas court denied the petition for certification to appeal, the petitioner appealed to this court, claiming that (1) the habeas court abused its discretion when it denied the petition for certification to appeal and (2) the habeas court improperly, inter alia, "concluded that he was not prejudiced by his trial counsel's mishandling of his alibi defense . . . ." *Tutson* v. *Commissioner of Correction*, 144 Conn. App. 203, 204, 72 A.3d 1162, cert. denied, 310 Conn. 928, 78 A.3d 145 (2013). Bodner continued to represent the petitioner but was unable to attend oral argument before this court. Attorney Temmy Ann Pieszak represented the petitioner for purposes of oral argument. In dismissing the petitioner's appeal, this court did not reach the merits of his claim on the ground that the petitioner, in his petition for certification to appeal, had not raised a claim related to the habeas court's determination that his trial counsel's failure to present Rooty's alibi testimony was not prejudicial. Id., 221.

Thereafter, the petitioner initiated the second habeas action that is the subject of this appeal. His second amended petition for a writ of habeas corpus, filed October 20, 2014, contained two counts alleging that (1) the performance of his habeas trial counsel, Bodner, was deficient,[4] and (2) the performance of his habeas appellate counsel, Bodner and Pieszak, was deficient.[5] As to count one, the petitioner argued that but for Bodner's deficient performance, the result in the prior habeas corpus proceeding and "criminal trial and/or appeal would have been different and more favorable . . . ." As to the second count, the petitioner claimed that both Bodner and Pieszak had rendered deficient performance as his habeas appellate counsel. The petitioner also argued that prejudice should be presumed as to both counts pursuant to *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689, 699 A.2d 1003 (1997).

At the second habeas trial, which was held on November 5, 2014, Bodner, Attorney Sheila S. Iverson, the petitioner's trial counsel, and Pieszak testified. On April 2, 2015, the habeas court issued its memorandum of decision. As set forth in the court's memorandum of decision, "Bodner testified that there was no strategic reason for her failing to include the 'prejudice issue' in the petition for certification to appeal." Pieszak "testified that she did not recall the content of the petition for certification to appeal, nor did she refer to it in preparation for oral argument before the Appellate Court." She also testified that, as a general matter, "there can be no strategic reason for habeas appellate counsel not raising a challenge to a habeas court's prejudice finding." Ultimately, the second habeas court determined that "the petitioner ha[d] failed to demonstrate prejudice in that, upon a review of the entire record, there [was] not a reasonable probability that the habeas appeal [from the first habeas court's ruling] would have been different. . . . It is clear to this court, upon a review of the entire record, that the [first] habeas trial court's assessment of [Rooty's] credibility and the substance of her testimony . . . at the [first] habeas trial that she was not certain that the events she related to [the first habeas court] were actually related to the day of the shooting, that the prior habeas court's findings would not have been reversed on appeal." Accordingly, the second habeas court denied the petition for a writ of habeas corpus, and thereafter granted the petition for certification to appeal. Additional facts will be set forth as necessary.

On appeal, the petitioner presents two claims. First, the petitioner argues that the second habeas court erred in concluding that he did not demonstrate that he was prejudiced by Bodner's failure to challenge the first habeas court's prejudice determination because there was no "reasonable probability that had [the first habeas court's] prejudice ruling been raised in the petition for certification to appeal," thereby allowing this court to review his claim, "the result of the prior habeas appeal would have been different." Second, the petitioner contends that the second habeas court erred by not presuming that he was prejudiced by Bodner's failure "to raise the issue of [the first habeas court's] improper prejudice determination in the petition for certification to appeal from the prior habeas decision." We disagree with both claims.

We begin by setting forth the appropriate standard of review for a challenge to a denial of a petition for a writ of habeas corpus. The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. *Correia* v. *Rowland*, 263 Conn. 453, 462, 820 A.2d 1009 (2003). The conclusions reached by the habeas court in its decision to deny a habeas petition are matters of law, subject

to plenary review. *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 566, 941 A.2d 248 (2008).

We are guided by the following relevant legal principles. To succeed on an ineffective assistance of appellate counsel claim, the petitioner must satisfy both the performance prong and the prejudice prong of *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Small* v. *Commissioner of Correction*, 286 Conn. 707, 712–13, 728, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). "In *Strickland* . . . the United States Supreme Court enunciated the two requirements that must be met before a petitioner is entitled to reversal of a conviction due to ineffective assistance of counsel. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversarial process that renders the result unreliable." (Internal quotation marks omitted.) *Bowens* v. *Commissioner of Correction*, 104 Conn. App. 738, 740–41, 936 A.2d 653 (2007), cert. denied, 286 Conn. 905, 944 A.2d 978 (2008). "A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong, whichever is easier." *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 91, 52 A.3d 655 (2012).

"The first part of the *Strickland* analysis requires the petitioner to establish that appellate counsel's representation fell below an objective standard of reasonableness considering all of the circumstances." (Internal quotation marks omitted.) *Vivo* v. *Commissioner of Correction*, 90 Conn. App. 167, 171, 876 A.2d 1216, cert. denied, 275 Conn. 925, 883 A.2d 1253 (2005). To satisfy the prejudice prong, the petitioner must demonstrate that "there is a reasonable probability that, but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed in his direct appeal, i.e., reversal of his conviction or granting of a new trial." *Small* v. *Commissioner of Correction*, supra, 286 Conn. 722. Thus, "to determine whether a habeas petitioner had a reasonable probability of prevailing on appeal, a reviewing court necessarily analyzes the merits of the underlying claimed error in accordance with the appropriate appellate standard for measuring harm." Id.

Therefore, had the first habeas court's prejudice ruling been challenged in the petition for certification to appeal and had the first habeas court denied the petition, this court, on appeal, would have applied a well settled standard of review. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's

ruling constituted an abuse of discretion. *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). To prove an abuse of discretion, the petitioner must demonstrate that the resolution of the underlying claim involves issues that are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further. Id., 616. If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits. Id., 612." *Joseph* v. *Commissioner of Correction*, 153 Conn. App. 570, 574–75, 102 A.3d 714 (2014), cert. denied, 315 Conn. 911, 106 A.3d 304 (2015).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . [and verify] the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Morquecho* v. *Commissioner of Correction*, 164 Conn. App. 676, 682, 138 A.3d 424 (2016).

We bear in mind that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [T]he question is whether there is a reasonable probability that, absent the [alleged] errors, the [fact finder] would have had a reasonable doubt respecting guilt." (Internal quotation marks omitted.) *Crespo* v. *Commissioner of Correction*, 149 Conn. App. 9, 18–19, 87 A.3d 608, cert. denied, 311 Conn. 953, 97 A.3d 984 (2014); see also *Cullen* v. *Pinholster*, 563 U.S. 170, 189, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . That requires a substantial, not just conceivable, likelihood of a different result." [Citation omitted; internal quotation marks omitted.]).

"In making this determination, *a court hearing an ineffectiveness claim must consider the totality of the evidence before . . . the jury. . . .* Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . We note, however, that the [*Strickland*] principles . . . do not establish mechanical rules. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being

challenged. In every case [we] should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." (Citation omitted; emphasis added; internal quotation marks omitted.) *Crespo* v. *Commissioner of Correction*, supra, 149 Conn. App. 19. "We emphasize that the task before us . . . is to determine, under *Strickland*, whether there is a *reasonable probability* that the petitioner would have prevailed on appeal." (Emphasis in original.) *Small* v. *Commissioner of Correction*, supra, 286 Conn. 731.

We first clarify the issue before us. The first habeas court denied the petition for a writ of habeas corpus because it concluded that the petitioner had failed to establish his ineffective assistance of counsel claim. Specifically, the first habeas court, having heard and evaluated Rooty's testimony, found that the petitioner was not prejudiced by his trial counsel's failure to file an appropriate notice of alibi defense to present Rooty as an alibi witness. Thereafter, the habeas court denied the petition for certification to appeal, which had not explicitly challenged the habeas court's ruling on prejudice. On appeal, however, the petitioner briefed and argued that the first habeas court erred in concluding that the petitioner was not prejudiced. This court declined to review this claim because it had not been raised in the petition for certification to appeal. See *Tutson* v. *Commissioner of Correction*, supra, 144 Conn. App. 221. Thus, in order for the petitioner to succeed in this case, we must conclude that, had Bodner challenged the first habeas court's prejudice finding in the petition for certification to appeal and had the first habeas court subsequently denied his petition, the petitioner would have prevailed in his prior appeal to this court. In other words, the petitioner bears a heavy burden of persuading us that the denial of the petition for certification to appeal on this issue would have been an abuse of discretion and that the first habeas decision would have been reversed on its merits. Our analysis does not yield such a result.

Our review of the record leads us to conclude that the petitioner has failed to establish that there is a reasonable probability that, but for Bodner's failure to challenge the first habeas court's prejudice ruling on the petition for certification to appeal, the petitioner would have prevailed in his appeal from the prior habeas court's judgment. We first examine Rooty's testimony. At the criminal trial, she clearly testified to having dropped off the petitioner at Julia's residence.[6] At the habeas trial, during direct examination, Rooty presented a different version of events, namely, that she was with the petitioner at the time of the commission of the crime because they, along with "Rel," were driving from Hartford to New Haven at about the time

of the shooting. In recalling a conversation with the petitioner's trial counsel, who was inquiring whether Rooty could "recollect anything about that day," Rooty testified that she replied to this inquiry that she "really just didn't know besides [stating to the petitioner's trial counsel] that [she and the petitioner] spent a lot of time together, so, as far as the exact date of everything that happened, that so much had happened in [her] life, [she] couldn't really recall that." On cross-examination, when pressed on her recollection of the timeline of events, she acknowledged that "the dates that were being thrown at me, and things that had happened had gotten my days misconstrued." It is axiomatic that we do not assess the credibility of witnesses; see *Veal* v. *Commissioner of Correction*, 54 Conn. App. 384, 386, 735 A.2d 833, cert. denied, 251 Conn. 907, 738 A.2d 1094 (1999); thus, we refrain from doing so here.[7] We do note that both versions of Rooty's testimony are inconsistent with Weaver's rebuttal testimony. Weaver testified that Rooty was interviewed shortly after the crime, and that she had stated that the petitioner borrowed her automobile on the morning of the shooting and that "she was unaware of the location of the vehicle until Weaver had contacted her after the shooting." *State* v. *Tutson*, supra, 278 Conn. 729. As opined by our Supreme Court, "[t]he serial submission of various alibis before and during the trial strongly suggests fabrication. The [petitioner], who was arrested within hours of the alleged crime, in all likelihood knew where he was in the preceding hours and knew who, if anyone, would be able to verify his alibi. Thus, the submission to the court of conflicting alibis indicates that Rooty's testimony would not have been truthful." Id., 744 n.12.

In light of all the evidence before the jury, even if Rooty had testified, it is not reasonably probable that her testimony would have created a reasonable doubt as to the petitioner's guilt, which leads us to conclude that the petitioner would not have prevailed on his appeal from the first habeas court's judgment. First, the jury heard testimony from Molina and Pagan identifying the petitioner as the driver of the Neon. See *State* v. *Tutson*, supra, 84 Conn. App. 615–16. Second, the jury heard the testimony of Fung Kwok, a criminalist at the state forensic laboratory concerning the results of the gunshot residue tests. Id., 617. Kwok testified that the gunshot residue test performed on Washington was "100 percent conclusive that the residue found on Washington was from a gunshot." Id. Kwok's testimony provided evidence by which the jury reasonably could infer that the petitioner was the driver of the Neon. Third and last, the state recalled Weaver as a rebuttal witness to impeach Rooty's credibility. See id., 619. The jury heard Weaver's testimony that entirely contradicted Rooty's testimony that she had dropped off the petitioner at Julia's residence on the day of the shooting. See id. Accordingly, we conclude that the second

habeas court properly determined that the petitioner failed to establish that he was prejudiced by the alleged deficient performance by his prior habeas appellate counsel. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 522, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

We briefly address the petitioner's second claim. He contends that the second habeas court erred by not presuming prejudice as a result of Bodner's failure to challenge the first habeas court's prejudice ruling in his petition for certification to appeal. He relies on *Iovieno* v. *Commissioner of Correction*, supra, 242 Conn. 706, for this proposition and seeks, sub silentio, a remand of the case to the first habeas court to consider the merits of his petition for certification to appeal with the inclusion of the issue of prejudice. See id., 708. We conclude that a remand is not necessary because we have addressed the claim of error as to prejudice in this appeal. We determined that the petitioner did not establish that there was a reasonable probability that, but for Bodner's failure to include the prejudice finding in the first habeas petition for certification, the petitioner would have prevailed in his appeal from the first habeas judgment. Thus, even with a presumption of prejudice, the petitioner could not prevail in either habeas case.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] A detailed recitation of the facts of the petitioner's underlying offenses, as reasonably found by the jury, can be found in *State* v. *Tutson*, 84 Conn. App. 610, 612–15, 854 A.2d 794 (2004), rev'd, 278 Conn. 715, 899 A.2d 598 (2006).

[2] Specifically, the petitioner's trial counsel had learned that, according to Rooty, the petitioner was dropped off at approximately 1 p.m. at Wethersfield Avenue, and Rooty drove the Neon, with her child inside, to a friend's residence in the north end of Hartford, where she briefly stayed to watch soap operas. Rooty told the petitioner's trial counsel that she returned for the petitioner at about 2 p.m. This more detailed version of events was not provided to the court until May 20, 2002, at the petitioner's sentencing hearing in support of a motion for a new trial.

[3] At the petitioner's criminal trial, Rooty testified that on March 26, 2001, at approximately 10:30 a.m., the petitioner accompanied her to a doctor appointment in Meriden. The appointment lasted approximately forty-five minutes. After dropping off a prescription, Rooty then drove the petitioner to his residence in Windsor. Rooty testified that the petitioner spent approximately twenty minutes in his residence because "he had taken a shower . . . ." After leaving Windsor, the petitioner, according to Rooty, asked her to take him to see his friend, "Rel . . . in the south end of Hartford."

[4] Regarding his claim against his habeas trial counsel, Bodner, the petitioner alleged that she (1) "conceded the petitioner's claim of ineffective assistance of trial counsel through her inaccurate representation to the court concerning the performance of Attorney Sheila [S.] Iverson [the petitioner's other trial counsel] at the petitioner's trial, and through her failure to present any evidence regarding the scope of . . . Iverson's involvement in the trial"; (2) "failed to adequately present the petitioner's claim of ineffective assistance of trial counsel pertaining to the mishandling of the petitioner's alibi

defense at his criminal trial"; and (3) "[f]ollowing the judgment of dismissal rendered by the habeas trial court, she failed to raise and/or clarify, in the petition for certification to appeal or through appropriate postjudgment motions, the improper conclusion of [the] habeas trial court . . . that the petitioner was not prejudiced by his trial counsel's mishandling of his alibi defense."

[5] In claiming that both his habeas appellate counsel's performances were deficient, the petitioner alleged that Bodner and Pieszak (1) "failed to properly or adequately raise, in the petition for certification to appeal, the improper conclusion of [the] habeas trial court . . . that trial counsel's handling of the petitioner's alibi did not constitute ineffective assistance of counsel"; (2) "failed to properly or adequately address the determination by habeas trial court . . . that trial counsel's errors regarding the presentation of the petitioner's alibi did not prejudice the petitioner"; (3) "failed to file any motions for articulation, or further articulation, in order to clarify the court's ruling and ensure appellate review of the habeas trial court's ruling on the alibi issue"; and (4) "failed to obtain appellate review of the . . . habeas trial court's dismissal of the petitioner's claim of ineffective assistance of trial counsel for trial counsel's mishandling of the petitioner's alibi defense."

[6] At trial, Rooty was precluded from testifying further. The petitioner's trial counsel, however, represented to the court that Rooty's proposed testimony would have been that she "drove her Neon to the north end of Hartford after she dropped the [petitioner] off at Julia's residence between 12:30 p.m. and 1 p.m., and that she picked him up at 2 p.m." *State* v. *Tutson*, supra, 278 Conn. 736.

[7] The respondent, in his appellate brief, argues that the petitioner could not prevail on his first claim because, inter alia, "the record reveals that Rooty's credibility was highly questionable." In his reply brief, the petitioner counters that "the [first] habeas court . . . did credit the testimony of Rooty . . . ." He argues for the first time that "the lack of credibility of Rooty's testimony was determined largely because of the multiple versions of Rooty's *proffered* testimony, not Rooty's own testimony." (Emphasis in original; internal quotation marks omitted.) The petitioner urges us to remand this case for a new trial if we conclude that no trier of fact has made a credibility determination of Rooty's testimony. We decline such invitation. "The appellate courts of this state have often held that an appellant may not raise an issue for the first time in a reply brief. . . . An appellant's claim must be framed in the original brief so that it can be responded to by the appellee in its brief, and so that we can have the full benefit of that written argument." (Citations omitted; internal quotation marks omitted.) *Niblack* v. *Commissioner of Correction*, 80 Conn. App. 292, 298, 834 A.2d 779 (2003), cert. denied, 267 Conn. 916, 841 A.2d 219 (2004).